We have four argued cases this morning. Mr. Wolfe, are you ready to proceed? Thank you, Your Honor. May it please the Court, Matthew Wolfe for Boston Scientific. The Board's findings that a truly significant medical invention, one that's already saved broadly speaking on two of those legal errors. First, the Board's one-sentence conclusion that there was a reasonable expectation of success. And second, its dismissal of the overwhelming evidence of the secondary indicia of non-obviousness. A little housekeeping question. Do you agree that Claim 1 is representative? Yes, Your Honor. Okay. In terms of the reasonable expectation of success, under Honeywell and its progeny, the Board must make a specific finding that a person of skill in the art would have in 2004 had a reasonable expectation of success in combining the prior art without hindsight. The sum total of the Board's conclusion in this regard is found on page 68 of the final written decision. On page 66268 in the blue brief, you argue that Sapien III embodies your claimed invention. Yes, Your Honor. Entitling you to a presumption of nexus, because Sapien III has to have, quote, a replacement valve, commissure support element attached to the expandable anchor, close quote. Yes, Your Honor. Otherwise, the device would fall apart. The intervener says that's waived because you didn't raise it below. Is it true? And if it's not true, where do you raise it? Your Honor, it is not true. It is raised, for example, at the hearing itself before the Board at A-965, where that precise argument was made. It was made in a number of different ways, in fact. And the argument is simply, I mean, the commissure support element must be attached to the stent. In this case, there's a clear structural window that acts to hold the It's clearly a structure distinct from this, and we have the pictures in the brief, the surrounding latticework of the stent. The Board made a fundamental claim construction error. It found that if you use the word attached, that means you must have an A and a B separate at some point that are then brought together, in the same way that a handle of a water pitcher is deemed attached if it's screwed on, but somehow would not be deemed attached if it was integrally made in the forging process. This Court has found time and time again that attached doesn't mean a method of manufacture. It means that there must be a connection, and there's clearly a connection between the commissure window and the rest of the stent latticework. So the sum total of the reasonable expectation of success analysis is, quote, and this is on page 68, A-68, we agree with Petitioner that the proven capabilities of sealing suggested by the success of fabric seals in the stent graft context supports an expectation of success where the same features to be applied to replacement valves. That is legally insufficient under in-touch and similar cases where the Court has said they have to explain, the Board has to explain why it finds something, the burden is on the Board. Even more troubling, it's tautological. It's saying because it worked with AAA devices, with the big, relatively healthy abdominal aortic valves, it would work in this much different environment, and that's just not what the evidence suggests. But more importantly, the burden was on the Board to explain why it chose that evidence, and it simply doesn't do so. On that basis alone, remand would be appropriate, on that basis alone. But we actually went below and explained why you wouldn't have a expectation of success, and broadly speaking, they fall into three categories. First, the anatomy of the aortic valves are very different than the anatomy of the heart valves. The simple reason is because in our procedure, the TAVI procedure, the old calcified valves are pushed back, and you have to account for that when you're trying to deal with leakage. There's no such problem or issue with the AAA valves, and the Board is completely silent on this undisputed, unambiguous anatomical difference. At least explain to us why it is that you say we can take one from column A and one from column B, when column A and column B are addressing very different anatomies. The second issue of calcification, we discussed this at length in our brief. I just want to explain that it was undisputed, undisputed, that the calcifications in the heart are different than the calcifications in the AAA context. The Board's response to this is, well, in the corner case, in that rare instance, you might have a healthy valve, but where is the law that says you have a motivation to combine features for the rare instance? As their own expert, or rather, petitioner's expert, Dr. Buller acknowledged, you want TAVR to work in a calcified environment. There is no evidence that anyone in 2004 thought AAA devices, the seals around them, would work in a calcified environment. As I understand it, both Thornton and Elliott, those references talk about calcified tissue, and Dr. Buller pointed that out, and I can't remember, maybe it was the Elliott reference that talks about, well, when we have this flared skirt like this, the peripheral edges of that skirt are able to displace into whatever, the gaps that exist due to the calcified tissues are irregular shapes, and so, therefore, it's successfully able to occlude and stop leakage of blood around the rim of the implant. Yes, Your Honor, and Dr. Manganaro and Dr. Brecker explained that calcification in the healthy artery in the AAA context is radically different than calcification in the heart, and when we confronted Dr. Buller at his deposition, and this is, we set it out the whole Q and A in our briefs, when we said, look, yeah, calcification, the word appears in both places, but it means something very different in these two contexts. What do you say to that? He said, I haven't analyzed it. I don't think anybody has. Well, in fact, Dr. Manganaro, who actually lived in the AAA world, unlike Dr. Buller, had, had explained it, and it remains unrebutted to this day in this case. Didn't Dr. Brecker say something about how the gaps can be very small in, in the, I guess, the disease valve that you're trying to insert the replacement valve into, something as small as 0.1 millimeters? Yes, Your Honor, and this kind of goes to that error I was talking about a minute ago. There is no doubt that in the corner case, the extreme case, the, the particularly healthy heart valve or the unhealthy AAA valve, there might be some overlap. But the question we have is, would one of skill and the art be motivated to combine? And you're not motivated to combine A and B to solve the corner case. And, and Dr. Buller acknowledged that. You want to treat the calcification of the situation in front of you. And so I think this is a legal error by the board to suggest that because there are extreme cases in one or the other of overlap, that that sort of showing motivation to combine. No, the question is, would one of skill and the art say, aha, those AAA seals will, will solve my problem in the heart? And they wouldn't, because at their core, typically, they are very different problems. The last issue with this regard is, is it goes to the experts. And, and I don't want to be flippant here, Your Honors, but if, if we're talking about operating systems, for example, and one person brings in Bill Gates and someone else brings up, you know, a grad student from a local university who might meet the minimal definition of a person of skill in the art, I can envision a case where you'd say, I'm going to reject Bill Gates's opinion over this grad student, but you owe an explanation for why you did that. And time and time and time again, this board chose Dr. Buller over Drs. Manganaro and Brecker, despite the fact that the latter are the Bill Gates's of this to AAA procedure. Kennedy. Well, you, you agree that he met the, the qualifications as an expert. Well, yeah, we're, at the bare minimum, but yes. The, the issue is not exclusion. The issue is, and again, this Court has said, if you're going to choose expert A over expert B, you've got to tell us why you chose him. And particularly here, where we have extremely qualified experts who lived in this world at the time, who are describing the anatomy versus someone that's, that only knows this stuff because he read it in a book, at least the board has to explain why they chose Dr. Buller over Drs. Manganaro and Brecker. And they just don't. They just say, we did. We believe Dr. Buller. Well, why? He doesn't have the experience that the others do. He doesn't have, either now or at the time. He didn't work in both worlds. He, he only knows, he's only one of personal skill in the art because he read the book. Well, what they said was, he's an expert. Yes. We, we believe him. And you should defer to us because of that. That's right, Your Honor. And I don't believe that's sufficient under this Court. You have to explain why you believe him. They didn't, they didn't find that Manganaro and Brecker were incredible in the sense of liars. They didn't say, we find them to be dishonest. They just chose one opinion over the other for reasons that remain unknown to this day. If I can shift gears to the issue of secondary considerations. Unlike most cases, it is undisputed, in this case, that the invention contributed to the success of the product and was directly praised as an, being an innovation. And this is from A5832, just an example. A doctor said the Sapien III valve is, quote, a very clear advance on previous designs, which incorporates the skirt. A very clear advance. This is real time, real world descriptions of industry praise. Their own expert, Mr. Woods, said, and this is at A7199, that the success of the Sapien III skirt is due, or the Sapien III is due in part to the skirt. The, the, the invention. Well, why doesn't the Board take that seriously? All they say is, well, there are other features. There are other things that were cool in the Sapien III, too. Maybe there were, but that's not the question for this Court. If, if Apple introduces a new device that has three different, very neat features in it, one of which infringes, their answer is, you don't have to think about secondary considerations as to feature one, because features two and three are also cool. That's not the law. But it's a long felt but unsolved need, and that's their argument. And, and there is, the evidence is replete that it was long felt and unresolved. In 2003, 2004, at the very beginning of this process, there had only been two or three implants, people realized that paravalvular leakage was a problem. You're into your rebuttal, just so you know. Okay. You can keep going. Yeah. It was not solved until the skirt was put into devices in the 2012-13 window. But why is that the right span of time? Why isn't the right span of time the, the span from the 2003 recognition of a problem and your invention, which is not long? Absolutely not. But your, but your Honor, unless people actually bring it into the real world and see that it works. I mean, the skepticism of this product remains. The patent sat there for four years while my client worked on bringing a prototype to market. And it wasn't until the prototype was seen in 2008 that people took it seriously. And in fact, was copied by the petitioner, who then put it in their next generation of valve. And in Europe in 2009, 2010, it worked like gangbusters. They went through the FDA process. It can't be that that period of time stops when the patent issues. What if no one reads the patent? Or more likely, as in this case, what if people think it won't work until they actually try it? And so the relevant period for long felt need is, when is the need identified? And, and when is it actually in the real world? Not necessarily a commercial product, but in clinical trials or whatever the case may be. When is it tested and determined it worked? And with that, your Honor, I reserve the rest of my time for rebuttal. Thank you. Let's hear from the Governor. Good morning, your Honors, and may it please the Court. Here, the Board's decision is supported by substantial evidence. First, I would like to address the point that was made about whether or not Boston Scientific weighed its claim construction argument. The only time that Boston Scientific raised that issue with respect to the attachment of the Commissure's 2000- Well, let me take you to where I think I have an issue. And that's on page 50 of the Blue Brief, where Boston Scientific says the PTAB veered when it credited Dr. Buller's testimony above the testimony of their experts, because in contrast to their expert, he has no relevant experience with sense catheter aortic valve replacement, surgical valve replacement, or abdominal aortic endografts. There's a clear logic to that. Why shouldn't we listen to it? Sure, sure. Here, what the Board found was that Dr. Buller did have experience with And also, at the time of the invention in 2004, there had only been a handful of these types of prosthetic heart valve replacements done. Only a handful. And Dr. Brecker, Boston Scientific's expert, also admitted as such that only a handful of these had been done. And so, therefore, one of skill in the art at the time of the invention in 2004 could have been a cardiologist that had a working knowledge of at least implanting these types of stent prosthetic devices. And Dr. Buller met this definition. Further, Dr. Buller's testimony that was presented before the Board was supported by the evidence of record. And that was shown in what Dr. Buller relied on with respect to what was taught in the stent graft art. In particular, the Elliott reference teaches that fabric seals can be used to prevent leakage between prosthetics and native tissue. And further, that these fabric seals can be used in calcified and irregular environments. Therefore, not only was Dr. Buller's testimony supported by the record, but the Board also found here that there was a reasonable expectation of success, which was the second argument that was raised. What do you say about Mr. Wolf's point that not all calcifications are equal? So, Dr. Buller, or, I'm sorry, Dr. Manginaro made that argument as well as Dr. Brecker. But what the Board found is that they made those arguments with no supporting evidence. So they made that argument based on their experience. But, again, remember, as of 2004, not that many people had actually implanted these devices in these environments. And so this experience is probably, or rather, their testimony is riddled with hindsight because it's based on an experience that happened post-2004. Also, they didn't actually cite to any supporting evidence with respect. Just forgive me. But is what you just said responsive to what I thought I heard Mr. Wolf say, which is that everybody who knows anatomy knows that calcification in the region of the body that Elliot was focusing on would be different from calcification in the heart area that this invention is focused on? That, Boston Scientific's experts said, a flap in one truly cannot be counted on to do the same work as a flap in the other. Well, again, a reasonable expectation of success does not require absolute predictability. Yeah, we always say that. Reasonable predictability. Somewhere between here and here.  And nobody has any idea where we are. Well, again, Dr. Brecker did testify that even in calcified heart valve environments, the gaps could be very small. And so because the Elliot reference does teach that these flaps would prevent sealing, or would prevent leakage between prosthetics and native tissue, even when there is irregular topography and calcification, it would have been reasonable for a person of ordinary skill in the art to understand that those environments. And so, therefore, board's findings are supported by substantial evidence. Finally, with respect to the secondary indicia of non-obviousness, the board did credit Boston Scientific's arguments with respect to industry praise and commercial success. But what the board found is that this was a predictable area of art. Not only was the problem known, the risk of PDL, which Boston Scientific admits, but there were solutions that were known as well. And so the fact that, sorry, that those of the time used other types of solutions to address PDL goes against the record evidence here that there was some sort of secondary indicia of non-obviousness. So even though they did show some modicum evidence of non-obviousness, the overwhelming evidence in the record shows that these types of devices would have been obvious at the time of the invention. What is the overwhelming evidence if it kind of comes down to what a skilled artisan would have understood about some probability, whatever it is, of success of moving this skirt flap device from one area of the body to another where it had never been done before? That's really, I mean, maybe it's sufficient, but overwhelming if there's serious secondary considerations, saying industry praise in particular. It says this is actually, this is terrific. I mean, why do you say that if it's just, you know, a morning's work? Anybody could have done it. Sure, there was evidence of industry praise. But what the board also found was that Boston Scientific had not shown that there was failure of others, that there was unexpected results here. And because of that, because the problem of PVL was known, and because solutions to address PVL were known, they simply did not meet their burden to show that there were this overwhelming evidence of non-obviousness. What the record actually shows is that those of skilled VR knew that there was a problem to be solved and knew of ways to solve the problem. I'm sorry, let me just interrupt. Now I think you just used overwhelming evidence in something like the mirror image way. Have we ever said that secondary considerations have to be overwhelming, except for some very technical, it must outweigh and therefore overwhelm the evidence from the art? That's not what you could have meant. Sorry, I apologize. I misspoke. What I wanted to articulate was that here it did not outweigh the evidence of obviousness. And that is because there is evidence in the record showing that the fabric seals used in Elliott and Thornton were successful in preventing leaks. And therefore, it would have been reasonable for one of ordinary skilled in the art to understand that these types of seals would also work in a prosthetic device as a closed dispenser. Would you agree that if there is an industry praise, say for example, significant industry praise about the patented feature, about the patented advance, then that should be given credit. And that industry praise is not undermined if there's industry praise about additional features of some commercial embodiment. Would you agree with that? So if there's industry praise about elements one, two, and three, the praise directed towards element one isn't undercut in any way by additional praise for elements two and three. Would you agree with that? I wouldn't agree with that. If elements two and three were also shown to have significant adoration by the industry, if the public found that those features of the device, of a multi-component device, were also given a lot of praise, then I think that would undercut any industry praise shown for one particular feature of a multi-component device. And why? I mean, let's say, hypothetically, I have the opposite instinct. Can you explain to me why your position makes more sense? So I think that would make more sense only because these other features could also be the subject of great inventive output. There could also be patents on those other features. And if there are, then there would also be a recognition that those other features are also inventive. So the fact that the industry praise is praising other features of the device, it would have gone to one of those other features of the device in order to commercialize it. I should think that your best argument is that the industry praise might be because it's Boston Scientific. And as a consequence, people pay attention when Boston Scientific puts something on the market. And while there may have been equally useful devices, nobody ever noticed. But I don't know if there's anything in the record that indicates that. Right. Well, also, Boston Scientific here is pointing to the petitioner's product for showing industry praise and commercial success. Edwards is a pretty substantial company. Yes, Edwards is a pretty substantial company. And Edwards' prior devices also had significant praise and commercial success. So with respect to the commercial success evidence, it's also unclear whether or not Edwards' market share had something to do with the fact that their second generation device also had such commercial success. Can I ask you, as a doctrinal matter, am I right in thinking that the task of deciding what to do with the mix of considerations, secondary on the one hand, sorry about that, and the prior art stuff on the other is a law task for us. It's not a fact task for the board. That is a good question. In Inland Steel, for example, the court looked at the board's consideration of unexpected results in comparison with the board's consideration of what the prior art showed. And the court indicated that the board's weighing of those considerations were given deference. Robert, we don't have an unexpected results is a little bit, straddles the same topic as reasonable expectation of success, I think, or something awfully close. But industry praise, which is kind of the interesting one here. Right. So I agree that the overall conclusion with respect to obviousness is a question of law. And therefore, the ultimate weighing of whether or not a certain element showed obviousness or non-obvious is one of law. But the court does give deference to the board's individual weighing of each consideration that the board considers, because each of those considerations are questions of fact. So I think that's the best answer I can give you. I'm not sure there's a better one. Last question for me is, I know we can find statements in our case law which say that when it comes to judging the time frame for long-felt need and failure of others, the cutoff point will be at the time of the invention. And I'm wondering, is that the right way to think about it? The other side makes a point and rests on a kind of logic that says, well, I mean, if the industry, even after the filing of their patent application, is still struggling to solve a problem, and then they continue to struggle, then why shouldn't that also be taken into account, even though that time of struggle is occurring after the filing date of their patent application? So I think that could also depend on what industry we're talking about. Here we're talking about an industry where the products have to be approved by a regulatory agency. So even though, first, backing up to the 2004 date. The 2004 date is their priority date, but it's not their filing date. They filed it later. So that disclosure that they're relying on of their application wasn't public until later. Second, the products that are at issue here have to be approved by the FDA. So even though there was time that elapsed between the 2004 date and when one of the SAPIEN devices was on the market, there was a period of time where that SAPIEN device was developed and then went through approval. So it's hard to just, it's hard to basically figure out how much time is necessary in these types of cases. I think here it's clear that PBL was known, and it's clear that there were solutions that were being addressed for PBL much earlier than the date that they say that they were. So I don't think that their evidence here provides a coherent argument for a long-tail case. Thank you, Your Honor. Just a few points I'd make. First, to your questions sort of going, does the size of the company perhaps dictate the industry praise? I would just ask the Court to look at the blue brief at 34 to 36 and the gray at 25 to 27. Very good, Your Honor. Let's go on to the issue of failure of others. In 2005 to 2007, and we have this in our brief, but let me just give you an example. At A6098, Edwards itself said of its SAPIEN XT, quote, no PBL reduction solution. They were characterizing their own work. And so this notion that because the first generation had reduced PBL from X to 30 doesn't mean that the industry wasn't struggling and failing to reduce it from 30 to 2, where it sits today, thanks to my client's invention. Can you, on the assumption that perhaps less weight was given in the overall obviousness legal conclusion to secondary considerations than should have been, our task is to try to assess the strength of the primary consideration evidence. What's the core thing that you think is missing from that side? The core thing that's missing is, if I understand your question correctly, Your Honor, is the reasonable expectation of success of going from down here to up here. From going from a relatively healthy, and just to be clear for Elliott, remember this was the point that my learned counsel quoted on, Elliott itself says it should be placed in healthy portions of the A order. That's at A1710. So it's not about distance as the final written decision. It's about the fundamentally different, both original anatomy, where you're pushing valves back where it's clear, and also then the disease of that initial anatomy has very different, fundamentally different characteristics. And it was a breakthrough to realize you could use a skirt to fill with blood, to clot, to seal, to lock, and to prevent paravalvular leakage around the out cell. That was a breakthrough. None of that's discussed in Elliott, Thornton, or Cook in any context, let alone in the unique and very challenging anatomy of the human heart. The last point I would make is, and this is kind of goes to, I'm sorry? You can wrap it up. Yes. Can I make the last point? Yeah, if you do it quickly. Yes, Your Honor. The last point, and this is one of the most frustrating things about reading the final written decision, and it was repeated today, which is that Manganaro and Brecker, our experts, were conclusory in their statements of that anatomy. These guys are the expert. These guys are the ones that lived it, that breathed it, that defined it, that wrote the textbook. So to say that there are opinions that are conclusory are like, to use the analogy, saying Bill Gates is conclusory when he talks about the history of the operating system, or Roy Williams is conclusory when he talks about the development of half-court offense. These are the guys that know it. These are the guys that lived it. What else do you want? And to dismiss it by saying it's conclusory is just refusing to address the issue at hand, which is that this was a breakthrough that has saved lives. Thank you very much.